UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CIRCLE CLICK MEDIA LLC, et al.,

          Plaintiffs,

   v.

REGUS MANAGEMENT GROUP LLC, et al.,

          Defendants.

Case No.  12-cv-04000-EMC

**ORDER DENYING PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

Docket No. 345

## I.  INTRODUCTION

Plaintiffs Circle Click Media, LLC and CTNY Insurance Group filed the instant putative class action against Defendants Regus Management Group, LLC, Regus Business Centre LLC, Regus PLC, and HQ Global Workplaces LLC (collectively, Regus).  Docket No. 65 (Second Amended Complaint) (SAC).  Regus is in the business of leasing fully equipped commercial office space using an Office Service Agreement (OSA).  *See* SAC at ¶¶ 34-41.  The OSA identifies the office location, lease term, initial payment amount, and monthly payment amount. *Id.* at ¶ 23; *e.g.*, Docket No. 346 (Aalaei Dec.), Exh. 1.  Plaintiffs allege that the actual monthly payment amount (as stated in Regus's monthly invoices) exceed the monthly amount stated on the OSA because Regus charges mandatory fees that are not adequately disclosed until after the lease is signed.  In particular, Plaintiffs contend that Regus failed to adequately disclose three required service fees: (1) a mandatory $30 per month, per-person "Kitchen Amenities Fee" (KAF); (2) an "Office Restoration Service" (ORS) fee for normal wear and tear; and (3) a "Business Continuity Service" (BCS)" fee for forwarding mail and phone calls after a customer vacates the office.  SAC at ¶¶ 26, 52.  Plaintiffs also allege that as to customers who signed up for telephone services, Regus's business practices violate California Public Utilities Code (CPUC) section 2890(a).  *Id.* at

**United States District Court**
For the Northern District of California

¶ 97.  Finally, Plaintiffs allege that Regus overcharges taxes, which it then retains instead of paying the amount to the relevant tax authority.  *Id.* at ¶ 101(f).  Based on these contentions, Plaintiffs bring claims for: (1) violations of California Business & Professions Code section 17200 (Unfair Competition Law) (UCL); (2) violations of California Business & Professions Code section 17500 (California False Advertising Law) (FAL); and (3) unjust enrichment.

Plaintiffs previously moved for class certification in June 2015, seeking certification of a California class and a New York class.  Docket No. 238.  Judge Conti denied Plaintiffs' motion for class certification without prejudice, finding problems with typicality and predominance.  Docket No. 335 (Class Cert. Ord.) at 21-33.  Specifically, Judge Conti found that the class definitions were "overbroad" and included individuals who had OSAs that did disclose the mandatory fees on the face of the OSA, individuals who had not purchased telephone services, and individuals who were never exposed to the allegedly deceptive advertisements at issue.  *Id.* at 26-32.

Plaintiffs now bring a renewed motion for class certification.  Docket No. 345 (Mot.).  Plaintiffs seek to certify the following classes and subclasses:

(1) **California Class**, which will include:

> All persons who, on account of an office located in California, either (1) entered into an office accommodation agreement (OSA) using one of the Regus standard physical office space forms of agreement (which are the same or substantially similar to one of the forms identified as REGUS00657 - 00664, 00680 - 00686, 02093, 11477, 11478 - 11480 or 19664), did not have a corporate account, and paid or were charged for, on or after May 8, 2008, one or more of the Identified Charges which was not disclosed in the "comments" section of the OSA or in an addendum to the OSA; or (2) entered into an office accommodation agreement with an entity later acquired by Regus, did not have a corporate account, and paid to or were charged by Regus on or after May 8, 2008 one or more of the Identified Charges.

(2) **California Telephone Subclass**, which will include: "all persons in the California Class who paid or were charged a telephone handset rental fee."

(3) **California Class Action Waiver Subclass**, which will include: "all persons in the California Class whose OSA is dated on or after January 1, 2014 and whose OSA included a class action waiver substantially similar to the one in Regus19664."

(4) **New York Class**, which will include:

> All persons who, on account of an office located in New York, either (1) entered into an office accommodation agreement (OSA) using one of the Regus standard physical office space forms of agreement (which are the same or substantially similar to one of the forms identified as REGUS00657 - 00664, 00680 - 00686, 02093, 02097, 02099, 11477, 11478 - 11480 or 19664), did not have a corporate account, and paid or were charged for, on or after September 24, 2006, one or more of the Identified Charges which was not disclosed in the "comments" section of the OSA or in an addendum to the OSA; or (2) entered into an office accommodation agreement with an entity later acquired by Regus, did not have a corporate account, and paid to or were charged by Regus on or after September 24, 2006 one or more of the Identified Charges.

(5) **New York Class Action Waiver Subclass**, which will include "all persons in the New York Class whose OSA is dated on or after January 1, 2014 and whose OSA included a class action waiver substantially similar to the one in REGUS19664."  Mot. at 13-14.

Plaintiffs' motion for hearing came on before the Court on February 24, 2016.  For the reasons stated below, Plaintiffs' motion for class certification is **DENIED**.

## II.    BACKGROUND

A.    Statement of Facts

1.    Operative Documents

Regus's standard one-page Office Service Agreement (OSA), in printed form, has a front page identifying basic information (*i.e.*, the office location and term of lease) and the office monthly price.  *E.g.*, Aalaei Dec., Exh. 1.  The OSA also has a section for "comments," in which the parties can make note of special arrangements or discounts that were agreed upon.  *Id.*  The OSA incorporates by reference the Terms & Conditions, which are either on the back side of the printed OSA or accessible by hyperlink in the electronic OSA.  *See* Class Cert. Ord. at 3.  The Terms & Conditions were historically printed in five-point font, a size which was found to be "almost illegible."  *Id.*; *e.g.*, Aalaei Dec., Exh. 6 (Terms & Conditions).  The Terms & Conditions state that the operative agreement "is comprised of the front page describing the accommodation(s), the present terms and conditions and the House Rules."  Terms & Conditions at ¶ 1.1.  The Terms & Conditions require the customer to comply with the House Rules.  *Id.* at ¶ 1.2.  In 2014, the Regus increased the font size of the Terms & Conditions so that it would cover

two pages.  *See* Docket No. 279-13 (Veber Dec.) at Exh. 18.

The House Rules are a five-page document which is available to, but not normally given to customers.  *See id.* at ¶ 1.2 (stating that the House Rules "can be requested locally"); Aalaei Dec., Exh. 3 (House Rules).

Regus also uses a Services Price Guide (SPG).  Aalaei Dec., Exh. 5 (SPG).  The SPG generally consists of two pages (or one double-sided sheet), with the first page explaining what is included with a Regus office while the second page lists additional services.  *Id.*  In some versions of the SPG, the second page includes the header "Optional services to complete your office."  *Id.* Previous versions of the SPG include no such header; for example, from 2006-2008, the second page stated "Services Guide" and included two categories of services - "Most Popular Services" and "Other Services You May Need," while the February 2010 SPG's second page used the header "Our most popular services."  *See* Veber Dec., Exhs. 7, 15.  The SPG is supposed to be provided to the customer during the sales process, such as following a tour of the office space. Veber Dec., Exh. 6 at 11-12.

     2.   <u>Disputed Mandatory Fees</u>

At issue are three mandatory service fees which are not disclosed on the face of the standard OSA.  First, Regus imposes a mandatory Kitchen Amenities Fee (KAF), which "allows clients and visitors access to self-service coffee and tea."  House Rules at ¶ 13.  The KAF is not mentioned in the OSA or Terms & Conditions, but is mentioned in the House Rules, which states that the KAF "is mandatory and will be charged per office occupant."  *Id.*  The House Rules do not list the amount of the KAF; the amount is listed on the second page of the SPG.[1]  SPG at 2. The KAF has always been described as a required service, whether with an asterisk indicating that it is a "[r]equired service fee for all clients" or with "required" in parenthesis.  *See id.*; Veber Dec., Exh. 7 at 2, Exh. 15 at 3.

---

[1] On some, but not all, versions of the SPG, the first page explaining what is already included in the office states: "All areas are maintained for your use including a welcoming lobby area, a *fully equipped kitchen* and business lounge.  These are of no additional cost to you."  *See* SPG at 1 (emphasis added); Veber Dec., Exh. 7 at 1 (emphasis added); *but contrast with* Veber Dec., Exh. 15 at 2 (explaining that the KAF is for "[a] fully stocked kitchen serving unlimited Flavia gourmet hot beverages for you and your guests").

Second, Regus imposes a fee for "normal wear and tear," in which "Regus will charge an Office Restoration Service (ORS) fee to cover normal cleaning and testing and to return the accommodation(s) to its original state."  Terms & Conditions at ¶ 1.7.  The ORS is disclosed in the Terms & Conditions, but no price is listed.  Instead, the pricing is found in the House Rules, which lists the ORS as $2.00 per square foot.  House Rules at ¶ 37.

Third, Regus charges a Business Continuity Service (BCS) fee, where Regus will forward the customer's calls, mail, faxes, and visitors.  Terms & Conditions at ¶ 1.7.  The service lasts for three months after the end of the date of the agreement.  Like the ORS, the price is not listed in the Terms & Conditions but in the House Rules.  The BCS is "equivalent to three times the published monthly rates for [Regus's] standard Virtual Office Program, not to exceed $420 per month."  House Rules at ¶ 38.  However, if the customer receives no calls, mail, faxes, or visitors during the customer's stay, the BCS will not be charged.  Terms & Conditions at ¶ 1.7.

### 3. Regus's Sales Practice

Regus obtains customers from a variety of sources; it advertises in radio, television, print, internet banners, Craigslist, billboards, and on its website.  Veber Dec. at ¶ 12.  Regus salespersons also generate their own sales leads, which may come from working with real estate brokers and agents, prospecting local companies, and working with local business partnerships and existing customers.  *Id.*

Plaintiffs contend that "Regus has a highly centralized and tightly controlled business model."  Mot. at 4.  Plaintiffs point to Regus training documents, which explain that Regus's goal was to have a common "global standard" for its sale process, among other parts of its business.  Aalaei Dec., Exh. 9 at 1; *see also* Exhs. 16, 17.  Regus's training materials include a "Perfect Tour" video, which Regus tried to ensure that its salespeople would watch.  *See* Aalaei Dec., Exh. 17 (Gaudreau Dep.) at 157:23-25.  Regus also had an advertising presentation called "Highlights," which suggested talking points such as emphasizing the ease of signing with Regus (including the one-page agreement), flexibility, and simplicity.  *See* Aalaei Dec., Exh. 2.

During the sales process, prospective customers typically tour the office center.  Veber Dec. at ¶ 13.  The Regus salesperson takes the prospective customer through the office center,

1    before discussing price. *Id.* Regus salespeople are trained on the presentation of the SPG to

2    prospective customers through various written training materials, such as the "Presenting Price"

3    training manual. *Id.* at ¶ 19. For example, the "Presenting Pricing" training manual instructs

4    Regus salespeople on how to present the SPG following the office tour, ████████████████

5    ████████████████████ Veber Dec., Exh. 11 at19. ████████████████

6    ████████████████████████████████

7    ████████ *Id.* at 20. ████████████████████████

8    ████████████████████████████████ *Id.* (original

9    emphasis). ████████████████████████████

10   ████████████████████████████████

11   ████████████████████████████████ *Id.*

12   at 28. ████████████████████████

13   ████████████████████████████████████

14   ████████████ Veber Dec., Exh. 10.

15        Plaintiffs contend that Regus's goal is for clients not to review the Terms & Conditions.

16   Mot. at 7. They cite to Regus sales documents, ████████████████████

17   ████████████████████████████████

18   ████████████████████████████

19   Aalaei Dec., Exh. 34 (Regus SmartSelling training document). Plaintiffs also argue that Regus

20   updated its sales processes in ████, revising the sales process so that the Service Agreement

21   would only reflect the monthly office fee, not recurring service costs. Mot. at 8; *see* Aalaei Dec.,

22   Exh. 24 (Regus April 2004 Updated Workstation Sales Process document stating that ████

23   ████████████████████████████████

24   ████████████████████████████████

25   ████████████████████████ ) Thus, according to Plaintiffs, Regus

26   wanted to ████████████████████████████

27   ████████████████████████████

28   ████████████████████████████████

███████    *Id.* (Regus April 2004 Updated Workstation Sales Process document).  Plaintiffs also

contend that Regus is successful in hiding prices, as ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████     Aalaei Dec., Exh. 26 (Regus

Post Tour Cal Customer Findings PowerPoint presentation).

        Regus in turn contends that documents associated with the sales process have changed over

time, and that sales presentations are individualized and variable.  *See* Docket No. 358-2 (Opp.) at

4-6.  For example, Regus salespeople may discuss the fees at issue with the prospective client

during the office tour, or may disclose the fees in contracts, addenda, price quotes, and e-mails.

*Id.* at 4; Docket No. 280-1 (Spindler Dec.) at ¶ 12 (stating that with the typical client, she would

discuss the Terms & Conditions and the House Rules, including the BCS and ORS); Docket No.

280-8 (Zamansky (La Pena) Dec.), Exh. A (OSA disclosing KAF in the comments section);

Docket No. 280-9 (Zamansky (STG) Dec.), Exh. C (addenda making BCS optional).  Thus, Regus

argues that the question of whether it adequately disclosed the fees at issue cannot be a class-wide

question, but is an individualized question that is dependent on what occurred between the

customer and the Regus salesperson.  *Id.* at 14.

        4.        Named Plaintiffs' Experience with Regus

                a.        Circle Click

        Circle Click is the proposed representative of the California class.  Prior to renting from

Regus, Circle Click viewed advertisements and the Regus website stating that renting was

"simple" and "easy," and that the lease agreement was comprised of a "one-page office rental

agreement."  *See* Docket No. 349 (Ward Dec.) at ¶ 9.  Circle Click's principals, Ms. Ward and Mr.

Peterson, toured offices at two different locations on September 16, 2010.  *Id.* at ¶ 15.  During the

tour, Circle Click was not provided with a copy of the House Rules or the SPG, and Ms. Ward

states that they never received the House Rules or the SPG prior to moving into the office space or

during their tenancy.  *Id.* at ¶ 16.  Instead, the salesperson informed Circle Click that it could rent

the office for a fixed monthly price ($1,368), as set forth in the OSA.  *Id.* at ¶¶ 16-17.  The

**United States District Court**
For the Northern District of California

salesperson allegedly represented that the total monthly payment for the office space included all of the mandatory charges, and never informed Circle Click that certain optional services (*i.e.*, the KAF and BCS) were actually required purchases.  *Id.* at ¶¶ 17-18.

On September 17, 2010, Regus e-mailed Circle Click with a quote for two options: a "rent only" and a "rent + full services you would need (IT + kitchen)."  Docket No. 280 , Exh. A (Ward Dep.), Exh. 11.  This "QuickQuote"[2] stated that the "Total Average Monthly Rent Including Free Months" would be $1,208, while the "Total All - Inclusive (including kitchen fee & .5 MB Bandwidth & 3 users)" would be $1,598.  *Id.*[3]  Regus also e-mailed an opening charges statement that showed a breakdown of the costs, listing the fixed monthly office fee as $1,368.00, internet as $250.00, and 2 kitchens as $60.00.  Ward Dep., Exh. 14.  The accompanying e-mail explained that "[t]he base rent is actually lower at $1368 and the average . . . is $1140 per month.  With IT and Kitchen on top, that is an additional $310."  *Id.*  Thus, the KAF (but not the BCS or ORS) were apparently disclosed by the QuickQuote.

Circle Click entered into an OSA with Regus on September 27, 2010, listing the fixed monthly price as $1,368.00.  Ward Dec. at ¶ 41, Exh. C.  On October 12, 2010, Circle Click received its first invoice, which showed charges beyond the OSA's monthly price and bandwidth account.  *Id.* at ¶ 51.  Prior to this point, Circle Click contends that it did not read the Terms & Conditions prior to signing, due to the small font size.  *Id.* at ¶¶ 37, 44.  It was not until December 30, 2010, that a Circle Click principal read the Terms & Conditions, "with regard to one of the *renewals*."  Ward Dep. at 288:5 (emphasis added).  Circle Click also contends that this renewal was automatically done pursuant to an auto-renewal clause contained in the Terms & Conditions.  Ward Dec. at ¶ 53.  Circle Click ultimately ended the lease and refused to pay the BCS fee (charged at over $1,000), resulting in Regus collecting a penalty amount from Circle Click.  *Id.* at ¶ 69.  Circle Click did not pay the ORS either, according to Regus.  Opp. at 9 n.3.

---

[2] The QuickQuote is a sales tool used by Regus salespeople to provide customers with a proposed price for the office space.  Veber Dec., Exh. 6 at 14; *see also* Ward Dep., Exh. 11 (sample QuickQuote).

[3] The QuickQuote also stated: "Please refer to the attached Services Guide for a complete list of the additional services we offer."  However, it is unclear from the filing if the SPG was attached.

United States District Court
For the Northern District of California

b.  <u>CTNY</u>

CTNY is the proposed representative of the New York class.  CTNY first toured a Regus office in Connecticut in 2010, during which CTNY was not provided any notice of the mandatory KAF, BCS, and ORS fees.  Docket No. 350 (Fullerton Dec.) at ¶ 6.  It did not enter into a lease at that time.  In 2012, CTNY began to look for a New York office.  CTNY visited the Regus website, which advertised free rent, telephone and IT services, kitchen areas, and business lounges, and stated that there was one monthly price for the office space and a one-page rental agreement.  *Id.* at ¶ 10; *see* also *id.*, Exh. A.  When CTNY toured a Regus office in New York, it was not provided with the SPG or the House Rules.  *Id.* at ¶ 14.  Instead, the Regus salesperson represented that the monthly payment constituted the total monthly payment.  *Id.* at ¶ 15.  CTNY then executed an Online OSA.  *Id.* at ¶ 16; *see also id.*, Exh. C.  Prior to executing the OSA, CTNY could not open the link to the Terms & Conditions, and thus did not review them before signing.  *Id.* at ¶ 19.  Instead, it believed that based on Regus's representations that the total monthly price was set in the OSA ($1,106), it did not have to read the Terms & Conditions.  *Id.*

CTNY was billed for Internet charges, set up fees, KAF, ORS, and BCS, all of which it refused to pay because it did not authorize the charges.  *Id.* at ¶¶ 40, 44.  CTNY ultimately moved out of the Regus space after a couple of weeks.  *Id.* at ¶ 44.

B.  <u>Procedural History</u>

Plaintiffs originally moved for class certification before Judge Conti.  Docket No. 238. Like the instant motion, Plaintiffs sought certification of a California class and a New York class. Judge Conti ultimately denied the motion without prejudice.  In reviewing the Rule 23(a) requirements, Judge Conti found problems with typicality, particularly with respect to Plaintiffs' claim that the font size of the Terms & Conditions constituted a fraudulent business practice under the UCL.  Class Cert. Ord. at 21-23.  Because one of Circle Click's principals admitted to reading the Terms & Conditions after enlarging the font size, while CTNY's failure to read the Terms & Conditions was the result of its inability to download the Terms & Conditions from Regus's website, Judge Conti concluded that neither named plaintiff could show that "it was deceived or injured by the small font in the manner they allege on behalf of the class."  *Id.* at 23.

**United States District Court**
For the Northern District of California

Next, Judge Conti found that the Rule 23(b)(3) predominance requirement was not satisfied.  First, to the extent that Plaintiffs alleged deception based on an inability to read the font used in the Terms & Conditions or adequately disclose certain fees without justification, common questions did not prevail because some OSAs disclosed the mandatory fees in a comments section. *Id.* at 26-28.  Second, with respect to Plaintiffs' allegations that Regus failed to comply with the requirements set forth in California Public Utilities Code (CPUC) section 2890 for the contents of a telephone bill, the class was too broad because it included class members who never purchased phone service from Regus.  *Id.* at 29.  Finally, Plaintiffs' false advertising claims were based on Regus's website, including affirmative statements that offices are fully quipped, and that bills are all-inclusive, as well as its failure to disclose that renters would be required to pay the KAF, ORS, and BCS fees.  *Id.*  However, after Plaintiffs admitted that many members of the proposed class did not see the alleged advertisements, and in light of evidence that none of the alleged misrepresentations were on the website between December 2007 to March 2009 and from December 2010 to June 2014, Judge Conti concluded that the class definition was overbroad and common questions of facts and law did not predominate.

### III.  DISCUSSION

A.   Class Certification Standard

To obtain class action certification, a proposed class must satisfy the prerequisites of Rule 23(a), which are:

> (1)   the class is so numerous that joinder of all members is impracticable;
>
> (2)   there are questions of law or fact common to the class;
>
> (3)   the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4)   the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a)(1)-(4).  The purpose of these Rule 23(a) requirements is largely to "ensure[] that the named plaintiffs are appropriate representatives of the class whose claims they wish to litigate," and to "effectively limit the class claims to those fairly encompassed by the named

10

**United States District Court**
For the Northern District of California

1    plaintiff's claims."  *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct.. 2541, 2550 (2011) (citation

2    omitted).  This is because "[t]he class action is an exception to the usual rule that litigation is

3    conducted by and on behalf of the individual named parties only," and "[i]n order to justify a

4    departure from that rule, a class representative must be part of the class and possess the same

5    interest and suffer the same injury as the class members."  *Id.* (quotations omitted).  In addition,

6    "the proposed class must qualify as one of the types of class actions identified in Rule 23(b)."

7    *Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 985 (9th Cir. 2015).  Here, Plaintiffs

8    seek certification under Rule 23(b)(3), which, in addition to the requisites of Rule 23(a), requires

9    that the Court find "that the questions of law or fact common to class members predominate over

10   any questions affecting only individual members, and that a class action is superior to other

11   available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P.

12   23(b)(3).[4]

13        The class action is "an exception to the usual rule that litigation is conducted by and on

14   behalf of the individual named parties only."  *Dukes*, 11 S. Ct. at 2550 (citation omitted).  Thus,

15   the burden is on the "party seeking class certification [to] affirmatively demonstrate his

16   compliance with the Rule -- that is, he must be prepared to prove that there are *in fact* sufficiently

17   numerous parties, common questions of law or fact, etc."  *Id.* at 2551.  The court in turn must

18   conduct a "rigorous analysis" to ensure that the prerequisites of Rule 23 are met, which may

19   require "prob[ing] behind the pleadings before coming to rest on the certification question."  *Id.*

20   (citation omitted).  On the other hand, the task of the Court is not to adjudicate the merits of the

21   plaintiff's claim.  *See*, *e.g.*, *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1197

22   (2013) (finding that the question of materiality is common to the class, and that the plaintiff was

23   not required to prove materiality as "[s]uch a question is properly addressed at trial or in a ruling

24   on a summary-judgment motion.  The allegation should not be resolved in deciding whether to

25   certify a proposed class."); *Ellis v. Costco Wholesale Corp.*, 285 F.R.D. 492, 506-07 (N.D. Cal.

26   2012) ("the court must consider the merits to the extent necessary to determine commonality.

27

28   ───────────────
     [4] Plaintiffs request injunctive relief in their complaint, but bring move for certification solely
     under Rule 23(b)(3).

1   However, in peeking at the merits to determine whether commonality is present, [t]he court may

2   not go so far . . . as to judge the validity of these claims." (internal quotations omitted).

3   B.   Ascertainability

4       In class actions, district courts have generally required a showing of ascertainability.

5   Ascertainability requires that the class definition be "definite enough so that it is administratively

6   feasible for the court to ascertain whether an individual is a member" before trial, and by reference

7   to "objective criteria." *Daniel F. v. Blue Shield of Cal*., 305 F.R.D. 115, 122 (N.D. Cal. 2014).

8   This requirement makes clear "on whose rights are merged into the judgment, that is, who gets the

9   benefit of any relief and who gets the burden of any loss," and avoids subsequent litigation "over

10  who was in the class in the first place." *Xavier v. Philip Morris USA, Inc.*, 787 F.Supp.2d 1075,

11  1089 (N.D. Cal. 2011).

12      In the instant case, Plaintiffs' exclusion of "corporate accounts" may present an

13  ascertainability problem, given Regus's evidence that the criteria for such accounts has changed

14  and its inability to determine if clients were formerly considered a corporate account.  *See* Opp. at

15  23; Docket No. 358-6 (Gaudreau Dec.) at ¶¶ 5-9.  The Court will not resolve this issue, but will

16  assume that Plaintiffs satisfy the ascertainability requirement and proceed to analyze the Rule 23

17  criteria.

18  C.   Rule 23(a) Criteria

19      1.   Numerosity

20      A plaintiff satisfies the numerosity requirement if "the class is so large that joinder of all

21  members is impracticable." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir.1998)

22  (citation omitted). "While there is no fixed number that satisfies the numerosity requirement, as a

23  general matter, a class greater than forty often satisfies the requirement, while one less than

24  twenty-one does not. *Ries v. Ariz. Beverages USA LLC*, 287 F.R.D. 523, 536 (N.D.Cal.2012).

25      The parties do not dispute numerosity.  Judge Conti found that the California class had

26  potentially 20,992 persons, while the New York class potentially included 11,333 persons.  The

27  new class definition both expands and narrows the class definition; the class definition now

28  includes members who signed OSAs with a class action waiver (estimated 23,000 persons), and

excludes OSAs that list on their face or in an addendum the disputed mandatory fees.  Mot. at 15.

In the original class certification order, Judge Conti noted that such OSAs were a "minority."

Class Cert. Ord. at 28.  Thus, the Court finds that Plaintiffs satisfy the numerosity requirement.

### 2.   Commonality

In order to satisfy Rule 23(a)(2)'s commonality requirement, a plaintiff must "affirmatively

demonstrate" that their claims depend upon at least one common contention, the truth or falsity of

which "will resolve an issue that is central to the validity" of each one of the class members'

"claims in one stroke." *Dukes*, 131 S. Ct.. at 2551.  The Ninth Circuit has found that Rule

23(a)(2)'s commonality requirement is relatively limited.  *Mazza v. Am. Honda Motor Co.*, 666

F.3d 581, 589 (9th Cir. 2012); *see also Astiana v. Kashi Co.*, 291 F.R.D. 493, 502 (C.D. Cal.

2013) (finding that allegation that all class members were exposed to the same representations,

despite likely variation among class members in their motivation for purchasing the product,

satisfied the "relatively 'minimal' showing required to establish commonality").  Thus, not all

questions of fact and law need to be common to satisfy the rule. Instead, the lawsuit must call

upon the Court or jury to decide at least one factual or legal question that will generate a common

answer "apt to drive the resolution of the litigation." *Dukes*, 131 S. Ct.. at 2551; *see also id.* at

2556 ("even a single common question" will suffice to satisfy Rule 23(a)) (citation and internal

modifications omitted).

For the sake of this motion, the Court will assume that commonality is satisfied.  Plaintiffs

have alleged fifteen common questions, many of which would drive the resolution of the class

action, such as whether the written sales materials are misleading or whether Regus is required to

comply with the CPUC.  *See* Mot. at 16-18.  To the extent that Regus challenges Plaintiffs'

common questions because they "contrast[] significantly with the predominance of specific,

numerous, and individualized issues," such issues are better resolved at the predominance inquiry.

### 3.   Typicality

In determining typicality, the Court "looks to whether the claims of the class

representatives are typical of those of the class, and is satisfied when each class member's claim

arises from the same course of events, and each class member makes similar legal arguments to

**United States District Court**
For the Northern District of California

prove the defendant's liability." *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1019 (9th Cir. 2011).  Furthermore, "[u]nder the rule's permissive standards, representative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998).

The Court finds that Plaintiffs generally satisfy the typicality requirement.  In challenging typicality, Regus first relies on Judge Conti's finding that there is no typicality in the instant case because Circle Click's principal was able to read the Terms & Conditions, and CTNY's inability to read was because it could not download the Terms.  Opp. at 25.  However, Plaintiffs have disclaimed their reliance on the "unable to read" allegation, instead alleging that Regus's written documents fail to adequately disclose the contested fees.  Reply at 9 ("Plaintiffs do not base their § 17200 claim on the inability of class members to read the Terms and Conditions, so whether one could read the Terms and Conditions despite its small font is not relevant to class certification").

Second, Regus argues that Circle Click is not typical of the California Telephone Subclass because there is no evidence that Regus's authorization for telephone lines did not comply with the CPUC.  Opp. at 27.  At the hearing, Plaintiffs limited its CPUC claims solely to whether Regus's invoices satisfy the statute, mooting the authorization issue because Plaintiffs no longer bring a claim that Regus's authorization did not comply with the CPUC.  Docket No. 372 at 51:6-16.

Third, Regus contends that Plaintiffs failed to pay the fees at issue, and thus lack typicality.  The Court rejects this argument; the class definition includes individuals who paid *or* were charged the disputed fees, and both Plaintiffs were at least charged the fees.  For example, Circle Click paid the KAF, but refused to pay the BCS and ORS after it was charged.  Ward Dec. at ¶¶ 63, 69; *see also* Opp. at 9 n.3.  Regus then collected a penalty amount based on the BCS, and has a counterclaim against Circle Click based on its failure to pay the BCS.  *See* Docket No. 78 (Answer) at Counterclaims ¶¶ 24, 26.  In turn, CTNY was billed for the KAF, ORS, and BCS.  Fullerton Dec. at ¶ 40.  When it did not pay, Regus applied CTNY's retainer payments to the charges, and sent CTNY to collections for the amount of $13,000.  *Id.* at ¶¶ 41, 44.  Regus also has counterclaims against CTNY for failure to pay the BCS and KAF.  *See* Answer at Counterclaims

**United States District Court**
For the Northern District of California

¶¶ 27-32.  Thus, Plaintiffs are typical of other class members who were charged or paid amounts that were not disclosed.  For purposes of adequacy of representation, Plaintiffs suffer a real threat of injury as a result of wrongful charges; they are materially in the same position as those who have already paid the charge.  The incentive to litigate the legality of the charges is equivalent in both circumstances.

Fourth, Regus argues that neither Plaintiffs is typical of the class action waiver subclasses because neither signed an agreement that included a class action waiver.  This argument has merit.  The Ninth Circuit has found that "each subclass must independently meet the requirements of Rule 23 for the maintenance of a class action."  *Betts v. Reliable Collection Agency, Ltd.*, 659 F.2d 1000, 1005 (9th Cir. 1981).  Thus, certification of a subclass fails where a subclass representative is not a member of the subclass he or she seeks to represent.  *See id.* at 1005-06; *Berger v. Home Depot USA, Inc.*, 741 F.3d 1061, 1067 (9th Cir. 2014) (denying class certification for two of three proposed subclasses because the sole named plaintiff was not a member of either subclass, and thus "cannot prosecute claims on their behalf").  Plaintiffs counter that "[n]o separate Waiver Subclass representative is necessary because the claims of this Subclass are the same as other class members."  Reply at 14.  Plaintiffs cite no case law for this proposition, which is contrary to Ninth Circuit precedent.  *See Betts*, 659 F.2d at 1005-06; *Berger*, 741 F.3d at 1067.  Thus, the Court finds that Plaintiffs lack typicality to represent the proposed class action waiver subclasses.  Otherwise, Plaintiffs satisfy the typicality requirement.

       4.     <u>Adequacy</u>

The adequacy requirement looks at whether the putative class member will "fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  A named plaintiff satisfies the adequacy test if the individual has no conflicts of interest with other class members and if the named plaintiff will prosecute the action vigorously on behalf of the class. *See Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 985 (9th Cir. 2011).

The Court finds that adequacy would be satisfied in this case.  There is no evidence of a conflict of interest or issues of credibility, and Plaintiffs do not propose to waive elements of damage on behalf of the class to the detriment of other class members.  *Contrast with Tasion*

*Commc'ns, Inc. v. Ubiquiti Networks, Inc.*, No. 308 F.R.D. 630, 642 (N.D. Cal. 2015) (finding inadequacy because the named plaintiffs were willing to abandon damages that were "likely to exceed by many times the direct replacement labor costs Plaintiffs now seek" in order to obtain class certification); *O'Connor v. Uber Techs., Inc.*, Case No. C-13-3826-EMC, 2015 WL 5138097, at *15 (N.D. Cal. Sept. 1, 2015) (finding inadequacy because the named plaintiffs made no demonstration that the costs they were seeking to waive "were not so substantial so as to create a conflict of interest between the class representatives and class members.").  It also appears that class counsel has vigorously litigated the case, and has experience in class actions.  *See* Class Cert. Ord. at 25.

The Court rejects Regus's arguments that adequacy is not satisfied because Circle Click and CTNY did not pay the fees they seek to put at issue, or because Circle Click entered into a renewal agreement even after it was charged with the mandatory KAF.  Opp. at 27.  As explained above, Plaintiffs clearly have been harmed as they were charged the allegedly undisclosed fees, and the failure to pay does not create a conflict of interest with other class members who have paid.[5]  As for Circle Click's lease renewal, there is evidence that Circle Click's renewal was not voluntary, but the result of an auto-renewal clause contained in the Terms & Conditions that Circle Click alleges it did not read prior to the renewal.  Ward Dec. at ¶ 53.  In any case, even if the renewal was voluntary, Regus does not explain how this affects Circle Click's overarching claim that it was misled into entering the *initial* contract.

D.     Rule 23(b) Predominance

Having satisfied the Rule 23(a) inquiry, Plaintiff must next show that the proposed class claim meets the requirements of Rule 23(b), which requires the Court to determine that common questions of law and fact predominate over individualized issues, and that class adjudication is superior to individual litigation of the Plaintiff's claims. *See* Fed. R. Civ. P. 23(b)(3).

"Rule 23(b)(3)'s predominance criterion is even more demanding than Rule 23(a)."

---

[5] To the extent Regus is arguing that Plaintiffs are inadequate because they are subject to counterclaims, Judge Conti already rejected that argument, finding that "'counterclaims do not defeat class certification.'"  Class Cert. Ord. at 24 (quoting *Hester v. Vision Airlines, Inc.*, No. 2:09-cv-00117-RLH-RJJ, 2009 WL 4893185, at *5 (D. Nev. Dec. 16, 2009)).

*Comcast Corp v. Behrend*, 133 S. Ct.. 1426, 1432 (2013); *see also Astiana*, 291 F.R.D. at 504 ("The predominance analysis under Rule 23(b) is more stringent than the commonality requirement of Rule 23(a)(2)."). It is not enough simply to "establish that common questions of law or fact exist, as it is under Rule 23(a)(2)'s commonality requirement. The predominance inquiry under Rule 23(b) is more rigorous as it tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Id.* (citation omitted). On the other hand, "there is a clear justification for handling the dispute on a representative rather than an individual basis if common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication." *Mazza*, 666 F.3d at 589. In short, "the predominance analysis under Rule 23(b)(3) focuses on the relationship between the common and individual issues in the case, and tests whether the proposed class is sufficiently cohesive to warrant adjudication by representation." *Abdullah v. U.S. Sec. Assocs.*, 731 F.3d 952, 964 (9th Cir. 2013).

As explained below, the Court finds that Plaintiffs have a predominance problem for each of their claims.

### 1.   UCL Unfair and Fraudulent Business Practice and FAL Claims

Plaintiffs' UCL unfair and fraudulent business practice and FAL claims are based on Regus's failure to adequately disclose the KAF, ORS, and BCS fees. Mot. at 19. At the hearing, Plaintiffs explained that their claim of inadequate disclosure is not based solely on written documents which were similarly, if not uniformly, presented to all class members, a fact which would facilitate class-based adjudication. *See, e.g.*, *Kingsbury v. U.S. Greenfiber, LLC*, CV 08-00151 AHM (JTLx), 2011 U.S. Dist. LEXIS 71058, at *19 (C.D. Cal. May 23, 2011) ("Plaintiff and putative class members were given standard written purchase agreements which they all signed. Plaintiff does not rely on oral representations made by various individuals to establish fraud and false advertising. Rather, class members were presented with one document, a standard document, on which they relied. Plaintiff has therefore satisfied the predominance requirement of Fed. R. Civ. P. 23(b).") Instead, Plaintiffs acknowledge that their claim is also based on the documents the *way* the documents are *presented*, which includes the salesperson's pitch to the

**United States District Court**
For the Northern District of California

1   individual customer.  Docket No. 372 at 5:16-24, 7:14-15 (MR. VISHER: "Because our real claim

2   is: You've given us these documents in a way that causes you to think you don't need to read

3   them."), 7:20-23 (MR. VISHER: "our claim is that the terms and conditions, the way they are

4   presented to you is misleading and causes you to think that you don't have to look in there for a

5   fee."); 9:22-10:18 (THE COURT: So you are not relying on anything they said.  MR. VISHER:

6   No, what I'm saying is I'm relying on what they didn't say.).

7           In general, "[t]o state a claim under the UCL . . . 'based on false advertising or promotional

8   practices, it is necessary only to show that members of the public are likely to be deceived.' "

9   *Pulaski & Middleman, LLC*, 802 F.3d at 985 (quoting *In re Tobacco II Cases*, 46 Cal.4th 298, 312

10  (2009)).  Thus, the "representative plaintiff need not prove that members of the public were

11  actually deceived by the practice, relied on the practice, or suffered damages." *Davis–Miller v.*

12  *Auto. Club of S. Cal.*, 201 Cal. App. 4th 106, 121 (2011).  But while individualized proof of

13  deception, reliance, and injury is not required to seek relief under the UCL, "the question of likely

14  deception does not automatically translate into a class-wide problem," such as when there is

15  variation in whether class members were actually exposed to the challenged business practices.

16  *Berger*, 741 F.3d at 1068.  As the California Court of Appeal held in *Davis-Miller*, 201 Cal. App.

17  4th at 121, "a class action cannot proceed for a fraudulent business practice under the UCL when it

18  cannot be established that the defendant engaged in uniform conduct likely to mislead the entire

19  class."  In short, before determining whether there is a likelihood of deception, it must first be

20  determined what the customer saw and/or heard.  If the customer was not exposed to a particular

21  misrepresentation, then he or she has no standing to challenge that representation.  *Davis-Miller*,

22  201 Cal. App. 4th at 121 ("we do not understand the UCL to authorize an award for injunctive

23  relief and/or restitution on behalf of a consumer who was never exposed in any way to an

24  allegedly wrongful business practice") (internal quotation omitted).  Moreover, that

25  misrepresentation cannot be included in the mix of information used to determine on the merits

26  whether that consumer (and those like him/her) was "likely to be deceived."  Hence, the degree of

27  uniformity in the mix of information (or misinformation) presented to the class is a critical factor

28  in the predominance analysis in case such as this.

1    For example, in *Kaldenbach v. Mutual of Omaha Life Insurance Co.*, the California Court

2    of Appeal upheld the trial court's denial of class certification based on the lack of uniformity in

3    sales transactions.  178 Cal. App. 4th 830, 834 (2009).  There, the plaintiff brought a UCL claim,

4    alleging that he was induced through improper and deceptive sales practices to purchase a life

5    insurance policy with a "vanishing premium" component.  *Id.* at 835.  In support of class

6    certification, the plaintiff alleged that "all sales of [the policy] were based on the same scripted

7    sales presentations and computer illustrations that were misleading and omitted material facts."

8    *Id.* at 836.  The plaintiff further argued that the "sales operations and presentations . . . were

9    uniform in every respect and [the defendant] utilized standardized training methods, materials, and

10   scripts.  Agents were required to adhere to a sales script, and were specifically trained to disclose

11   only the potential benefits of the policy but conceal the risks."  *Id.*  In turn, the defendant produced

12   evidence that the information given to each prospective purchaser varied.  *Id.* at 839.   The

13   defendant's sales development manager also submitted a declaration stating that there was no

14   single or standardized sales method, but multiple sales methods, and that when new sales methods

15   or materials were adopted, agents were not required to use them.  *Id.*

16       In upholding the trial court's denial of class certification, the California Court of Appeal

17   agreed that "there was no evidence linking th[e uniform sales materials, training, and illustrations]

18   to what was actually said or demonstrated in any individual sales transaction."  *Id.* at 846.

19   Furthermore, the training materials and methods were not uniform throughout the class period, and

20   there was evidence that the sales agents were not required to take the training or utilize it --

21   instead, "they were free to ignore the training and written materials."  *Id.*  Thus, absent a "showing

22   of uniform conduct likely to mislead the entire class . . . the viability of a UCL claim would turn

23   on inquiry into the practices employed by any given independent agent--such as whether the agent

24   involved in any given transaction took [the defendant's] training and read [the] manuals or used

25   the training and materials in sales presentations, and what materials, disclosures, representations,

26   and explanations were given to any given purchaser."  *Id.* at 850.

27       By contrast, the district court in *Vaccarino v. Midland National Life Insurance Co.* rejected

28   a similar argument in certifying a class where the facts are different.  Case No. CV 11-5858 CAS

**United States District Court**
For the Northern District of California

(MANx), 2013 U.S. Dist. LEXIS 88612, at *38 (C.D. Cal. June 17, 2013).  There, the plaintiff brought UCL and fraud claims alleging that defendant's sale of deferred annuity products falsely promised a "bonus" to consumers, when in fact the defendant would charge the bonus back to purchasers through the use of a lower credited rate.  *Id.* at *3, 5.  As in *Kaldenbach*, the plaintiff focused on the uniformity of the sales experience for all purchasers, particularly the uniform sales brochures and disclosure statements.  *Id.* at *9.  Significantly, sales agents were required to review the brochure and disclosure statements with the purchaser, and to sign a certification statement attesting that the disclosure materials had been presented to the applicant and that the sales agent had made no statements differing in any significant manner from the material.  *Id.*

The defendant argued that there could be no presumption of reliance because sales presentations included individualized tailored sales meetings between the agent and the purchaser. *Id.* at *33.  The district court rejected this argument, finding that the class members received uniform representations, namely the brochures and disclosure statements.  *Id.* at *37.  Although the defendant presented evidence that the agent-purchaser interactions were unique, and that the certification statement did not prevent agents from explaining or providing additional information about the annuity products to prospective purchasers, the case was distinguishable from *Kaldenbach* because "the defendant required agents to adhere to its marketing materials in selling its products," citing the certification statement.  *Id.* at *38.  Furthermore, there was no evidence that the agents had ever disclosed that the bonus would be negated by the lower credited rate; at most, agents stated that the bonus "may" affect credited rate.  *Id.* at *39.  In fact, the district court pointed out that an agent who did in fact disclose that the bonus was not in fact a bonus "would have run afoul of the certification statement contained in the disclosure form."  *Id.*  Thus, the district court concluded that "the purported disclosures made by some agents to some purchasers are not sufficient to render plaintiffs' fraud claim unsuitable for class treatment."  *Id.* at *40.

The predominance inquiry therefore must focus on the facts of the case to determine the degree of uniformity by which class members were exposed to the alleged deceptive conduct.  In the instant case, as noted above, Plaintiffs argue that the common practice that all class members are exposed to is both Regus's standard documents -- the OSA, the Terms & Conditions, and the

SPG -- and the *way* these documents are presented to the individual customers, namely the failure to adequately disclose the KAF, ORS, and BCS.  Reply at 1; Docket No. 372:14-17 (MR. VISHER: Our burden is to show that the way in which these documents are -- are designed and drafted and presented is likely to mislead a person to think that they can rent an office for the price stated in the contract.").  There are two major problems with Plaintiffs' uniformity argument.

              a.    <u>Contract Documents</u>

First, as to the documents, in many cases, the documents changed over time.  For example, Regus increased the font size of the Terms & Conditions so that the Terms & Conditions were not only more legible, but spanned two pages.  Veber Dec., Exh. 18.  This change may be significant because Plaintiffs contend in part that clients failed to read the Terms & Conditions because of the small font size.  *See* Mot. at 7 ("a Regus client would not expect hidden fees in something called 'Terms and Conditions' printed in a tiny font, and so would assume reading it to be unnecessary.").  Any reliance on this obscurity of the Terms and Conditions which Plaintiffs contend do not adequately disclose the existence and pricing of the KAF, ORS, and BCS is problematic in view of Plaintiffs' disclaimer of any reliance on the unreadability of the Terms and Conditions.  Plaintiffs did so because Judge Conti found that Circle Click's principal admitted to reading the Terms & Conditions after enlarging the font on her computer while CTNY failed to read the Terms & Conditions because they could not download them from Regus's website.  Class Cert. Ord. at 23.  Given these facts and disclaimer, Plaintiffs are not well situated to rely on the form of the Terms and Conditions as a basis for their claims of fraud and class certification.

Additionally, the form of the SPG -- which contained some disclosures relative to KAF charges -- changed over time.  Some versions had a second page with the header "Optional services to complete your office," while others did not.  *See* Veber Dec., Exhs. 7, 15; Aalaei Dec., Exh. 5.  Part of Plaintiffs' argument is that the SPG is misleading by including the required KAF on a page titled "Optional services."  Mot. at 6.  But given that some of the SPGs do not include such a header, there may be an individualized issue of what documents particular customers received in determining whether a customer was exposed to Regus's alleged practice of inadequately disclosing fees.

**United States District Court**
For the Northern District of California

b.    Sales Presentation

Second, as to the way the documents were presented, there is substantial evidence of variability in what documents were presented and how they were described and discussed by Regus salespersons.  Plaintiffs rely on the training materials, arguing that salespeople are trained to separate the service fees from the monthly office price (Mot. at 5; *see also* Aalaei Dec., Exh. 30), and that the training materials are silent about the need to disclose the BCS and ORS, so that those charges are not mentioned during the training process.  Mot. at 7; Reply at 6.

However, Plaintiffs' reliance on the training materials to demonstrate universal exposure of the class to the allegedly inadequate disclosure is problematic.  As in *Kaldenbach*, the evidence in the record shows that not everyone took the training or complied with it.  *See* 178 Cal. App. 4th at 839.  According to Mr. Pampinella's Expert Report, ■ of Regus's salespeople had registered for or completed training on "Location and Product Guide Training," ■ had registered for or completed training on "OnStage Pricing," and ■ had registered for or completed training on "Preparing and Presenting Price."  Docket No. 279-19 (Pampinella Report) at ¶¶ 65-66.  Thus, at least for some of the trainings, less than half of the salespeople even took the training, and likely even less had completed the training.  *See id.* at ¶ 67. Additionally, not all Regus salespersons complied with the training requirements.  For example, although the Regus training materials emphasize presentation of the SPG and how to go over the different services, *see* Veber Dec., Exh. 11 at 19-20, Regus's Secret Shopper tests found that ■% of the secret shoppers received the SPG, while ■% received the SPG and understood the pricing details.  Pampinella Report at ¶¶ 71-73.  Similarly, while Plaintiffs contend that the training materials encouraged salespeople to hide the service fees until after a customer signed the OSA, *e.g.*, Aalaei Dec., Exh. 25, in Circle Click's case, the KAF was put on the QuickQuote and Opening Charges Statement prior to signing the OSA.  *See* Ward Dep., Exhs. 11, 14; *contrast with* Veber Dec., Exh. 11 at 28.  In short, even if the training materials sought to implement a common global practice, there was significant variability as to whether salespeople took the training and whether they acted consistently with the training.

Additionally, in contrast to *Kaldenbach* where the plaintiffs argued that the sales agents were trained to disclose only potential benefits while concealing the risks, in the instant case,

**United States District Court**
For the Northern District of California

Regus's training material is more ambiguous. *See* 178 Cal. App. 4th at 836. While Regus's training materials focus on separating the cost of the office from the cost of the services, they also do *not prohibit* salespeople from making disclosures about the fees. *See* Aalaei Dec., Exh. 30. The training materials are *silent* about the BCS and ORS, and in fact appear to emphasize -- particularly with respect to the SPG -- that it is the "<u>responsibility</u>" of the Regus salesperson "to go through the prices so that the prospect understands what they will be paying on a monthly basis." Veber Dec., Exh. 11 at 20. Thus, there appears to be no clear and consistent training to conceal the disputed fees.

Further, Regus has presented evidence that in some cases, disputed fees *were* affirmatively disclosed. *Contrast with Vaccarino*, 2013 U.S. Dist. LEXIS 88612, at *39 (finding sufficient uniformity in sales presentation and noting that there was no evidence any agent had ever disclosed that the bonus would be negated by the lower credited rate, and that an agent who did in fact disclose the bonus would "run afoul of the certification statement" that the sales agent had not said anything differing from the sales materials). As Plaintiffs concede, a customer who is affirmatively told about the fee is not deceived. Docket No. 372 at 11:15-18 (MR. VISHER: "in order for them to not be misleading, you would have to have some -- the salesperson would have to do something affirmatively to dispel your belief that you don't have to read those terms and conditions."). Regus provides declarations from three salespeople who state that it is their practice to disclose the disputed fees. Docket No. 280-1 (Spindler Dec.) at ¶ 12 ("With a typical client, I talked about the Terms and Conditions and the House Rules. I specifically mentioned the move out cost, such as wear and tear, and the business continuation fee. I mentioned the business continuation fee because, if it is a problem for the client, it was much easier to get it waived up front than at the end."); Docket No. 280-4 (Harris Dec.) at ¶ 3 ("It was my business practice to walk potential Regus clients through the House Rules, Service Price Guide, and Terms and Conditions. In particular, I made it a point to always tell potential clients about the Office Restoration Fee, the Business Continuity Service Fee, the Kitchen Amenities Fee, and Regus' 90 day notice requirement to terminate an agreement. I have done this for every tour I have given on behalf of Regus over my last 8 years of employment, which equals approximately two to three

**United States District Court**
For the Northern District of California

1  thousand tours."); Docket No. 280-5 (Aribzu Dec.) at ¶ 4 ("It was my business practice to explain

2  all of the fees and services associated with renting Regus office space to potential clients before

3  presenting to them an office service agreement.").

4        Regus also points to customer contracts with comments and addendum that disclosed the

5  disputed fees.  For instance, according to Mr. Pampinella's review of the comments sections of

6  1,933 OSAs over the 2011 to 2014 period for California and New York, approximately 18.3%

7  mentioned "kitchen," 18.6% mentioned "$30,[6] 3.5% mentioned "wear and tear," and 14.4%

8  mentioned "business cont."  Pampinella Report at ¶ 61, Figure 7.  While Plaintiffs' class definition

9  excludes customers with these comments and addendum, these facts nonetheless provide probative

10  evidence that there was *not* a universally uniform practice of not disclosing the disputed fees.

11        While Regus's evidence may not be compelling, it is sufficient to show variability in how

12  the sales documents were presented.  Although Plaintiffs might have to overcome such evidence

13  by showing a consistent pattern by Regus salespeople in failing to disclose the disputed fees -- for

14  example, by providing surveys showing a consistent practice in the field -- Plaintiffs present no

15  such evidence.  Instead, Plaintiffs chose to rely solely on the training material, which not all Regus

16  salespeople were required to take or comply with, and which itself appears ambiguous as to

17  whether fees should or should not be disclosed.  *See* Docket No. 372 at 13:13-14:3 (stating that

18  there is no survey asking if people were told about the fees).

19            c.    <u>Conclusion</u>

20        In a class certification motion, the burden is on Plaintiffs to demonstrate that they satisfy

21  the Rule 23 criteria.  *Dukes*, 11 S. Ct.. at 2551; *Berger*, 741 F.3d at 1067 ("A putative class-action

22  plaintiff has the burden of showing that his or her claim meets the requirements of Rule 23").

23  Plaintiffs fail to meet that burden in this case.  The variability in not only the form of the

24  documents but, more importantly, in the way the documents and terms of the deals were

25  presented, in the absence of evidence of a consistent practice, requires fact-based determinations

26  as to each class member in order to resolve whether the particular mix of information presented

27  _____

28  [6] Regus's counsel represented, and Plaintiffs' counsel did not challenge, that the KAF is the only $30 fee charged by Regus.  Docket No. 372 at 61:1-7.

would likely deceive the consumer.  *In Re Tobacco II*, 46 Cal. 4th at 312; *Kaldenbach*, 178 Cal. App. 4th at 849-850; *Berger*, 741 F.3d at 1066, 1069 (upholding denial of class certification where Home Depot informed customers of the optional nature of a damage waiver through sales associates, signs posted in the stores, and the language of the final sales contract, and that "any oral notice given by Home Depot employees about the optional nature of the damage waiver during a particular rental transaction would necessarily be a unique occurrence").  *Cf. Mazza*, 666 F.3d at 596 (finding that class was overbroad because "the relevant class must be defined in such a way as to include only members who were exposed to advertising that is alleged to be materially misleading).  The Court therefore will not certify the UCL and FAL claims based on the inadequate disclosure of the disputed fees.

      2.    <u>UCL Unlawful Business Practice Claim (Telephone Sub-Class)</u>

Plaintiffs' UCL unlawful business practice claim is based on whether Regus violated CPUC section 2890.  As Plaintiffs made clear during the hearing, this CPUC claim is based solely on whether Regus's invoices comply with the statute, and not improper authorization.  Docket No. 372:6-16; *see also* Reply at 9.

As an initial matter, Plaintiffs have a fundamental pleading problem.  In their complaint, Plaintiffs alleged violations of CPUC sections 2890(a) (telephone bill may only contain charges for products or services that the subscriber has authorized) and 2890(b) (written orders must be unambiguous, legible, and in a minimum 10-point font, separate from any solicitation materials).  SAC at ¶ 97.  Plaintiffs do not allege violations of CPUC section 2890**(d)**, which states the requirements for telephone invoices.  In short, Plaintiffs have not pled the claim that they now seek to certify.

Even if the claim was properly before the Court, Plaintiffs have a *Comcast* problem.  Following the Supreme Court's decision in *Comcast v. Behrend*, 133 S. Ct.. 1426 (2013), district courts have found that "to certify a class under Rule 23(b)(3) a putative class plaintiff must show . . . that damages can be reasonably determined on a class wide basis using a common damages methodology."  *Newton v. Am. Debt Servs.*, No. C-11-3228-EMC, 2015 U.S. Dist. LEXIS 74626, at *25 (N.D. Cal. June 9, 2015) (citing *Comcast*, 133 S. Ct.. at 1430); *see also Rice*

**United States District Court**
For the Northern District of California

*v. Sunbeam Prods.*, 2:12-cv-07923-CAS(AJWx), 2014 U.S. Dist. LEXIS 26406, at *16 (C.D. Cal. Feb. 24, 2014) ("Under Comcast, courts can only certify a Rule 23(b)(3) class if there is evidence demonstrating the existence of a classwide method of awarding relief that is consistent with plaintiff's theory of liability"); *Astiana v. Ben & Jerry's Homemade, Inc.*, No. C-10-4387-PJH, 2014 U.S. Dist. LEXIS 1640, at *40 (N.D. Cal. Jan. 7, 2014) (declining to certify class where the plaintiff failed to provide evidentiary proof showing a classwide method of awarding relief consistent with plaintiff's theory of liability).  Here, Plaintiffs present no common damages methodology.  In fact, Plaintiffs admitted at the hearing that the likely remedy for this claim is injunctive relief, and were uncertain on whether damages would even be available.  Docket No. 372 at 52:14-23.  Given this complete failure to demonstrate the availability of damages and whether any such damages can be determined using a common methodology, the Court will not certify Plaintiffs' CPUC claims under Rule 23(b)(3).

       3.    <u>Unjust Enrichment Claim (Taxes)</u>

      To the extent that Plaintiffs' unjust enrichment claims are based on Regus's alleged failure to adequately disclose the fees at issue, the Court will not certify the unjust enrichment claim for the reasons stated above.  *See* Section III.D.1.

      Plaintiffs also raise a claim for whether taxes collected from clients were turned over to the taxing authority or improperly retained by Regus.  SAC at ¶ 101.f.  Plaintiffs present no evidence showing that predominance would be satisfied for this claim.[7]  At the hearing, Regus explained the complications of determining whether taxes were overcharged or improperly retained by Regus, as there are different taxes for products and services and there may be complex allocation questions, such that individualized issues would predominate because every individual invoice

---

[7] In general, Plaintiffs present little evidence showing that they would have a claim of failure to turn over taxes.  During the March 19, 2015 hearing on the parties' discovery dispute, Judge Corley observed that "with respect to the issue of whether the taxes are passed on, [Regus has] given [Plaintiffs], now, a sworn interrogatory response that say they pass it all on, they pay it, they're not committing the criminal act."  Docket No. 237 at 21:15-18.  Calling Plaintiffs' discovery requests a "fishing expedition," she asked what evidence Plaintiffs had to believe Regus was not passing on all of its taxes.  *Id.* at 21:24-22:2.  Plaintiffs admitted they had no expert testimony or evidence beyond counsel's own interpretation of one of the documents, *see id.* at 22:9-17, after which Judge Corley denied their discovery request.  *Id.* at 25:12-15.

**United States District Court**
For the Northern District of California

would need to be examined and calculated.  Docket No. 372 at 64:25-65:12.  Plaintiffs made no counterargument, and there is nothing in the record to suggest that common issues would predominate.  Again, because this is a motion for class certification, Plaintiffs have the burden of affirmatively demonstrating predominance, a burden that they have failed to meet.  *See Dukes*, 11 S. Ct. at 2551.

## IV.    <u>CONCLUSION</u>

Even assuming that ascertainability and Rule 23(a)'s requirements are satisfied, Plaintiffs have failed to demonstrate predominance in this case as required under Rule 23(b)(3).  The Court therefore **DENIES** Plaintiffs' motion for class certification.

This order disposes of Docket No. 345.

**IT IS SO ORDERED**.

Dated: March 11, 2016

_____
EDWARD M. CHEN
United States District Judge